# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 7, 2014

## STATE OF TENNESSEE v. JAMES WILLIAMS

**Appeal from the Criminal Court for Shelby County**
**No. 10-04815      James Lammey, Jr., Judge**

---

**No. W2012-02098-CCA-R3-CD  - Filed May 14, 2014**

---

The defendant, James Williams, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder, three counts of attempted first degree premeditated murder, and employing a firearm during the commission of a dangerous felony.  The jury sentenced him to life imprisonment for the first degree murder conviction, and the trial court sentenced him as a Range I offender to twenty-five years for each of the attempted murder convictions and as a Range III offender to fifteen years for the firearm conviction, with each of the sentences to be served consecutively to each other and consecutively to the life sentence. However, at the hearing on the motion for new trial, the trial court overturned and dismissed the firearm conviction, leaving the defendant with an effective sentence of life plus seventy-five years in the Department of Correction for the murder and attempted murder convictions. In a timely appeal to this court, the defendant challenges the sufficiency of the evidence in support of his murder and attempted murder convictions and argues that the trial court erred in admitting prior bad act evidence and in ordering consecutive sentences.  Following our review, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and ROGER A. PAGE, JJ., joined.

Paul K. Guibao (at trial and on appeal) and C. Anne Tipton (at trial), Memphis, Tennessee, for the appellant, James Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Fleming and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of a July 3-4, 2009 altercation the defendant had with his estranged wife, Mary Teresa Taylor, and her eighteen-year-old daughter, Kawanda Wainwright, which culminated in the defendant's pulling out a gun and shooting and killing Wainwright, shooting and injuring Taylor and her seven-year-old daughter, Arneshia Taylor, and attempting to shoot Taylor's fifteen-year-old daughter, Jamesha Taylor. After the shooting, the defendant handed the gun to his brother, walked away, and fled the state. He was eventually apprehended in Kansas City and returned to Tennessee, where he was tried before a Shelby County Criminal Court jury for the first degree premeditated murder of Wainwright, the attempted first degree premeditated murders of Taylor, Arneshia, and Jamesha,[1] and employing a firearm during the commission of a dangerous felony.

## Trial

The State's first witness at the defendant's April 16-21, 2012 trial was Mary Teresa Taylor, the defendant's estranged wife, who said she was in the process of divorcing the defendant. She testified that the defendant called her at about 6:00 p.m. on July 3, 2009, which was her birthday, to ask her to come visit him, so she walked around the corner to his apartment complex with her children, eighteen-year-old Kawanda, fifteen-year-old Jamesha, fourteen-year-old Destiny, seven-year-old twins Arneshia and Adrianna, five-year-old Trevon, and three-year-old Teresa, also known as "Redd." She was also accompanied by Kawanda's children, three-year-old Sparkle and six-month-old Ryan. When they arrived, she and the defendant went into his kitchen while the children went to a back porch. While they were visiting, "Redd" ran into the kitchen, told the defendant, "My daddy's dog is bigger than yours," laughed, and ran back outside. The defendant then looked at her and said, "B****, you must still be f***ing around with Redd's daddy."

Taylor testified that she answered "no," but the defendant began arguing with her. She told him that he was "trying to start that s**t" and that she was going to leave. The defendant replied that she was not going anywhere, but she ignored him, walked out the back door, told the children they were leaving, and started with the children down the steps. The defendant leaned over the balcony and asked where she was going. She told him that she was going home, and the defendant grabbed hold of her shirt. At that point, Kawanda said to him, "You[r] a** don't run my mama." The defendant replied to Kawanda, "B****, shut

---

[1] Because many of the parties share the last name, we will refer to some of the children by their first names only. We intend no disrespect in doing so.

the f*** up," and the two began exchanging curses and insults. As they were all walking past the driveway, Kawanda reached down and picked up a beer bottle from the ground. The defendant and Kawanda continued cursing at each other, and Kawanda threw the beer bottle down on the sidewalk beside the defendant.

Taylor testified that the defendant responded by pulling a gun out and firing shots up into the air before "all of a sudden" shooting Kawanda. She said when she saw the defendant shoot her daughter, she ran in front of him and he backed up and pointed the gun at her. She threw her hand up in front of her face, and he shot her in the finger. She started running down the street accompanied by her three-year-old daughter, her sixteen-year-old nephew, who had been standing on the street outside the defendant's apartment, and another one of her younger children. As she fled, she heard approximately five more gunshots. She testified that she ran to a corner gas station, looking behind her once during her flight to see the defendant walking, not running, from the scene.

Taylor related an earlier violent episode with the defendant, testifying that one day in March 2007, the defendant took her to a Kentucky Fried Chicken restaurant so that she could fill out an employment application. She said he was sitting beside her as she filled it out, and when she hesitated before marking the "single/married" box he became angry, said, "W****, you don't want to check the box?" and then "chunked" the application onto the floor and told her to come with him. She said when she got into the passenger seat of the car the defendant started speeding, telling her, "B****, I'm gonna take you somewhere and kill you." She said she was going to jump out the door, but the defendant had locked it, so she lowered the window and, as the defendant was grabbing hold of her shirt, managed to get her legs over the window and to jump from the speeding vehicle. When her body stopped rolling, she got up and asked a woman stopped at a red light to take her to the police. She testified that she sustained serious burn injuries to her leg, stomach, buttocks, back, arm, and chest, which required her to spend two days in the hospital and left her with permanent scars. At the request of the State, she exhibited some of her scars to the jury.

On cross-examination, Taylor testified that she had been married to the defendant since November 1999 and that he was the father of Destiny and Trevon. She acknowledged that Kawanda had been drinking vodka that night but insisted that she was not drunk. She testified that she and Kawanda were both arguing with the defendant when the shooting occurred, but she denied that she had to physically restrain Kawanda from the defendant. She acknowledged that in her statement to police immediately after the shooting, she reported that the defendant started "swinging the gun and firing like crazy."

On redirect examination, Taylor testified that Kawanda was "just standing right there" when the defendant shot her. She reiterated her earlier testimony that after the defendant shot

Kawanda, she ran up to him and he took one step backwards, raised his gun, aimed "[d]ead in [her] face," and shot her in the finger as she threw her hands up in front of her face. She explained that her statement to police that the defendant was "shooting wildly" was in reference to the way he fired multiple "back-to-back" gunshots as she and some of the children were fleeing down the street. On recross-examination, she acknowledged she never mentioned in her statement to police that the defendant first fired his gun into the air.

Nine-year-old Arneshia Taylor testified that on the night of the shooting she was coming out of the defendant's bathroom when she saw the defendant go into his room, get his gun, and place it in the front of his pants. She stated that her mother was outside the apartment at the time. She said she went back outside and the defendant came outside, pulled his gun out, and shot it up in the air one time. The defendant then shot Kawanda, her mother, and Arneshia, in that order. According to Arneshia's testimony, the defendant shot Taylor in the hand as she raised her hand up and shot Arneshia in the leg as she was running from the scene with Taylor and her sister, "Redd." On cross-examination, she testified that the defendant and Kawanda were arguing with each other immediately before the shooting. She also recalled that Kawanda had a bottle in her hand.

Dr. Miguel Laboy, an assistant medical examiner with the Shelby County Medical Examiner's Office, testified that he had reviewed the autopsy report on Kawanda Wainwright that was prepared by Dr. Lisa Fuente, the medical examiner who performed the autopsy, and that he concurred in her determination that the cause of death was a gunshot wound to the chest. The victim also had a recent injury to the back of her neck. The toxicology report prepared on the victim revealed she had a blood-alcohol level of .073%.

Sixteen-year-old Destiny Taylor testified that when she and her family arrived at the home of her father, the defendant, on the night of July 3, 2009, she went inside briefly to lay her six-month-old nephew down on the couch and then went back outside to talk to her friends on the porch. While there, she overheard "Redd" say from inside the apartment that her father's dog was bigger than the defendant's dog. She next heard the defendant ask Taylor if she had been seeing someone and Taylor answer "no," which was followed by the sounds of the defendant and Taylor talking. Next, Taylor came out of the apartment and announced that they were going to leave because the defendant was trying "to start something."

Destiny testified that she and the others were in the process of walking away from the defendant's apartment when the defendant grabbed Taylor's shirt and told her she was not going anywhere. Kawanda told the defendant to let her mother go, and the defendant eventually let go of Taylor's shirt, but he and Taylor continued to argue with each other as the family moved down the street. Kawanda cursed at the defendant, the defendant

-4-

approached Kawanda, and Kawanda dropped the beer bottle she was holding. At that point, the defendant shot Kawanda in the neck and she fell to the ground. The defendant then shot Kawanda again. Taylor approached him with her hand raised, and the defendant shot Taylor in the hand. Taylor then began running down the street with Arneshia and "Redd" while the defendant kept repeatedly shooting at her. Destiny testified that during that time, she was holding her six-month-old nephew in her arms and remained standing in place.

On cross-examination, Destiny testified that she was unable to recall having told the police, in a statement immediately after the shooting, that Kawanda was trying to hit the defendant with a vodka bottle. She acknowledged having told police that her little sister, Arneshia, was hit in the leg as the defendant was firing at Taylor, who was zig-zagging in her flight down the street.

Seventeen-year-old Jamesha Taylor corroborated her mother's and her sister's accounts about how the conflict on the night of the shooting began with "Redd's" comment to the defendant about the size of her father's dog. She also corroborated their accounts of how the defendant tried to prevent Taylor from leaving by grabbing her clothing and how Kawanda intervened on Taylor's behalf. She testified that when the family got outside the gate, the defendant let go of Taylor and shot a gun into the air. She stated that Kawanda ran beside a tree, and the defendant shot her three times, first in the neck, then in the side, and then a third time as she was trying to rise from the ground. She testified that Taylor ran toward the defendant and that he aimed his gun for her head. Taylor threw her hands up, and the defendant shot her in the "right finger." Taylor then grabbed Arneshia and "Redd" and started running down the street as the defendant continued shooting in her direction, in the process striking Arneshia in the leg and causing her to fall.

Jamesha testified that the defendant next aimed his gun at herself and Adrianna, pulling the trigger each time and causing the empty gun to make a clicking sound. The defendant did not, however, aim the gun at either of his own two children. Afterwards, he handed the gun to his brother, who was standing beside the gate, and nonchalantly walked off toward the interstate "like nothin' didn't ever happen." Jamesha testified that she was in shock after seeing the defendant shoot Kawanda and that when he pointed the gun at her, she said to him, "James, I didn't do nothing."

Jamesha related her part in the earlier episode with the defendant that occurred in March 2007, testifying that the defendant picked Taylor up that day at about 12:00 p.m. to take her to a Church's Chicken restaurant. She said when she next heard from her, Taylor was at the hospital and it was 8:30 p.m. Taylor came home the next morning and sometime that day a call came in from the defendant's mother's home phone number. Jamesha testified that she picked up the phone without saying anything. She said she then heard the defendant,

whom she had known her whole life and whose voice she recognized, say, "I'm going to hurt you all."

On cross-examination, Jamesha acknowledged that Taylor and Kawanda were arguing with the defendant and that Kawanda was cursing at him before the shooting. She testified that Kawanda picked up a beer bottle from the ground during the argument, that Taylor stepped in between Kawanda and the defendant, and that Kawanda then threw the bottle down, causing it to shatter. She said it was at that point that the defendant pulled his gun out and fired once into the air before shooting Kawanda. She stated that the defendant shot Kawanda either two or three times, with the first shot going past her leg as Kawanda was fleeing toward the tree. She estimated that the shooting occurred between 1:00 and 2:00 a.m. on July 4 and said that she heard a total of six shots that night.

Michael Faulkner, who was a resident of the defendant's apartment complex at the time of the shooting, testified that he heard the defendant and Taylor arguing in the defendant's apartment at about midnight on July 4, 2009. He said the argument then moved outside and started down the steps. He stated that he was standing on the other side of the steps, where he observed Taylor and Kawanda arguing with the defendant and overheard Kawanda telling her mother to walk to the store with her. According to Faulkner, the defendant became "super hot when she said that" and began cursing Kawanda, complaining that she was "always in [his] f***ing business."

Faulkner testified that the three continued arguing and cursing at each other as they moved down the steps and around the building to the street. He said he walked around to the other side of the building and watched as the argument continued in the street, hearing Taylor telling the defendant that she was going to leave and the defendant telling her to "come here." Kawanda then "walked up on [the defendant]," and it appeared to Faulkner that the two were about to fight. A fight never occurred, though. Instead, the defendant pulled out a gun, fired two shots into the air, and then shot Kawanda in the right side, causing her to fall down. Taylor backed up, and the defendant began firing at her. Afterwards, the defendant left the area.

Faulkner testified that he ran across the street, picked up Kawanda, and carried her back to the entrance of the apartments, where he laid her down before running inside his apartment to call the police. He stated that he reported to the police that the gun the defendant used was a chrome, six-shot, .22 caliber revolver. He said he assumed it was a six shot because most revolvers contain six shots. He could not recall how many shots the defendant fired but said that after the defendant shot Kawanda and Taylor, he continued to pull the trigger, but the gun had run out of bullets and just "went click, click."

On cross-examination, Faulkner testified that both the defendant and Taylor were drinking that night but that he never saw Kawanda drinking or with a bottle in her hand.

Eighteen-year-old Douglas Williams, the nephew of both the defendant and Taylor,[2] testified that he heard Taylor and the defendant arguing in the defendant's apartment for ten or fifteen minutes before his aunt came out of the apartment and began moving down the stairs with her children. He said the defendant followed her out about two minutes later, and the argument resumed. Once everyone reached the street, his uncle began shooting his .22 caliber, eight-shot revolver, which, Williams said, was a gun he was familiar with because he had seen it in his father's apartment. Williams testified that the defendant shot Kawanda first in the neck and then shot her again after she had fallen to the ground, shot Taylor in the hand, and shot his cousin, "NeNe" in the leg. Afterwards, the defendant "walked off like . . . didn't nothin' go on." Williams testified that Taylor and one of her children fled down the street and that he ran behind them to a place where Taylor flagged down a police officer. On cross-examination, he testified that Kawanda threatened to hit the defendant with a bottle just before the defendant started shooting. He said he was certain that he heard a total of eight shots fired.

Eric Thomas, an inmate at Northwest Correctional Complex, testified that when he was housed at the Shelby County Jail with the defendant, the defendant told him that he was facing the death penalty for having shot and killed his wife's daughter. He said the defendant told him that he was waiting at his apartment for his wife, who arrived much later than he expected. The defendant said he had a pit bull dog with him when he opened the door, and one of Taylor's girls ran in and said, "Oh, my daddy got a pitt [sic] bigger than this." Thomas said the defendant told him that he "immediately clicked" and deliberately began to "aggravate" his wife by accusing her of having been at the child's father's house.

Thomas testified that, at that point, the defendant interrupted his account of the shooting, saying to him, "But Celly, first let me tell you why I wanted to kill this b**** – about what they did to me in 1993." The defendant then related that in 1993 "the b**** mama," meaning his wife's mother, had shot at him three times in the living room. The defendant told him that he struggled with Taylor's mother for the gun, "body-slammed" her, and bit her "hard as hell" before someone hit him with a broom and a mop. The defendant said that "[t]hey finally got [him]" and that he was lying on the floor when "the b**** mama" ran up on him as if she were about to shoot him in the head. The defendant related that he looked up and saw his brother and others coming in the house. The defendant told him that he thought Taylor's mother had missed him when she shot at him but then realized

<hr>

[2]During her testimony, Taylor explained that Williams was the son of her sister and the defendant's brother.

that he had been shot twice, including once in the chest.

Thomas testified that the defendant then returned to relating the birthday shooting, telling him that his argument with Taylor moved outside his apartment and that a couple of her family members had broken a bottle. The defendant told Thomas that he said to himself, "Oh, I can kill these b****es right now. It be self-defense all day," and that he then shot Taylor's daughter, Taylor, and another one of her children. Thomas testified the defendant told him that he wanted to hurt Taylor the way she had hurt him. The defendant also told him that the prosecutor would never be able to prove that he held animosity toward Taylor and her family because he had married her and had a child with her after the 1993 incident. Finally, Thomas testified that the defendant reported the source of his animosity as two-fold: the incident in 1993 that he had described to Thomas, and the fact that Taylor "got pregnant" when they were separated.

Thomas said he was testifying against the defendant because he wanted to do the right thing. He explained that he had a daughter himself and that it bothered him how the defendant exhibited a "total lack of respect . . . for those young ladies." On cross-examination, he acknowledged his prior convictions for burglary, aggravated theft of property, aggravated assault, and multiple robberies and agreed that his sentences were not set to expire until 2024. He denied, however, that he was testifying against the defendant in the hopes of receiving help at his upcoming parole hearing. On redirect examination, he testified that the defendant told him that after Taylor's young daughter made the comment about the size of his dog, he "clicked" and said to himself, "I ought to kill these b****es right now."

Taylor's mother, Mary Louise Taylor, the State's final witness, testified that she was at home one day during the summer of 1993 when she received a distraught phone call from Taylor saying that she needed help. The witness said she took a gun and went to Taylor's home, where she found the defendant choking Taylor and holding a knife to her neck. The witness stated that she told the defendant to stop, but he did not so she began fighting with him. She said they were on the side of the porch, and the defendant dragged her and Taylor into the house. Once inside the house, the defendant was on the floor and the witness was on top of him as they continued to fight. During the struggle, the defendant bit the witness on the arm and grabbed for the gun and the witness shot him. At the request of the prosecutor, the witness demonstrated to the jury the scar on her arm from the bite. The witness testified that she was charged with a crime in connection with shooting the defendant but that the charge was later dropped. On cross-examination, she testified that, in addition to shooting the defendant in the chest, she also shot him somewhere near his face. She further testified that while she was "tussling" with the defendant for the gun, Taylor and the witness's other daughter, Delores, were hitting the defendant with mops.

-8-

The defendant's only witness was his fourteen-year-old niece, Dushana Williams, who testified that Gregory Williams was her father, Douglas Williams was her brother, and the defendant was her uncle. On the night of the shooting, she was outside on the balcony when she heard Taylor and Kawanda yelling at each other. The argument moved outside and to the street in front of the school. She stayed on the balcony to watch and from that position saw Kawanda, who had been drinking from a blue-topped bottle, raise the bottle in her hand and try to hit the defendant with it. According to the witness, the defendant then backed away from Kawanda and fired his gun two or three times in the air. At that point, the witness said, she ran inside her apartment to tell her father that the defendant was shooting his gun. She said she did not speak to the police about what she had witnessed. On cross-examination, she testified that she did not know if the bottle hit the defendant because she "really couldn't see down there" to the street from her position on the balcony.

The defendant elected not to testify and rested his case without presenting any additional witnesses. Following deliberations, the jury convicted him of the indicted offenses and, after the penalty phase of the trial, sentenced him to life imprisonment for the first degree murder conviction. The trial court subsequently sentenced him to twenty-five years for each of the attempted murder convictions. The trial court found that the defendant was a dangerous offender, that he committed the offenses while on probation, and that he was an offender whose record of criminal activity was extensive. Accordingly, the court ordered that the sentences be served consecutively to each other and to the life sentence, for an effective sentence of life plus seventy-five years in the Department of Correction.

## ANALYSIS

### I. Prior Bad Act Evidence

The defendant contends that the trial court abused its discretion by allowing prior bad act evidence about the defendant's alleged acts of domestic violence in 1993 and 2007. The defendant argues that the evidence was unnecessary for the presentation of the State's case and that its probative value was outweighed by "the prejudicial effect of labeling the [defendant] as a serial domestic abuser." The State responds that the trial court properly exercised its discretion in allowing the Rule 404(b) evidence on the basis that the incidents were relevant to the defendant's motive and intent to harm the victims and that their probative value outweighed the danger of unfair prejudice. We agree with the State.

Tennessee Rule of Evidence 404(b) provides as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action

in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Exceptional cases in which evidence of an accused's prior bad acts will be admissible include those in which the evidence is introduced to prove identity, intent, motive, opportunity, or rebuttal of mistake or accident. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[7][a] (5th ed. 2011). Where the trial judge has substantially complied with procedural requirements, the standard of review for the admission of bad act evidence is abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Because the trial court in this matter complied with the requirements of Rule 404(b), we review its rulings under an abuse of discretion standard.

Following pretrial hearings at which both Teresa Taylor and Jamesha Taylor testified about the 2007 incidents involving the defendant's threats against Taylor and her children, the trial court found that the evidence was relevant to a material issue of the defendant's premeditation, intent, and "settled purpose to harm." The court further found that the evidence regarding the defendant's conduct was clear and convincing, noting that Teresa Taylor had substantial scarring that was consistent with her account of having slid across asphalt or concrete after jumping from a moving vehicle and that it found both her and her daughter's accounts to be credible. Finally, the court found that the probative value of both incidents outweighed any danger of unfair prejudice.

We agree that the evidence was relevant to show the defendant's intent and motive

in committing the shooting and that the prejudicial impact of such evidence did not outweigh its probative value. We conclude, therefore, that the trial court did not err in admitting the evidence.

The trial court held a jury-out hearing mid-trial at which it considered Mary Taylor's proposed testimony regarding the 1993 incident that led to her shooting the defendant. At its conclusion, the court found that the evidence was relevant to the material issue of the defendant's premeditation, intent, and settled purpose to harm. In reaching this determination, the court noted that the witness's account corroborated the testimony of the jailhouse informant, whose credibility had been severely impeached by his numerous prior felony convictions, that the defendant had been harboring animosity towards Taylor and her family since the 1993 incident. The court also observed that the jailhouse informant could not have known what had happened with the defendant and Taylor's family in 1993 unless the defendant had told him. The court further found that the proof of the incident was "clear and convincing," noting that it had observed the outline of what appeared to be a bite mark on the witness's arm. Finally, the court found that the probative value of the evidence outweighed the danger of unfair prejudice.

We, again, agree that the evidence was relevant to show the defendant's premeditation, motive, and intent and that its prejudicial impact did not outweigh its probative value. Accordingly, we conclude that the defendant is not entitled to relief on the basis of this issue.

## II. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence in support of his murder and attempted murder convictions, arguing that the State failed to prove the element of premeditation beyond a reasonable doubt. Specifically, he asserts that the evidence is insufficient to sustain a finding of premeditation because the facts show that the shootings occurred as "an escalation" of an argument and only after he had been threatened with a bottle.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600,

604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of the first degree premeditated murder of Kawanda Wainwright and of the attempted first degree premeditated murders of Teresa Taylor, Arneshia Taylor, and Jamesha Taylor. First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). "Premeditation" is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). A jury may infer premeditation from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. Additional factors from which a jury may infer premeditation include the defendant's failure to render aid to the victim, see State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000), and evidence establishing a motive for the killing. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

Viewed in the light most favorable to the State, the evidence is sufficient to sustain the jury's finding that the defendant premeditated the murder of Wainwright and the attempted murders of Taylor, Arneshia, and Jamesha. Facts from which the jury could infer premeditation include: the defendant's retrieval of his handgun after the argument with Taylor began; his firing of multiple gunshots at the unarmed victims, including his firing at Wainwright after she was already on the ground; his pointing his gun directly at Jamesha and pulling the trigger; his calm departure from the scene after the shooting; his having confessed to his cell mate the long-term animosity he felt toward Taylor and her family; and his having seized the opportunity presented by the argument and the broken bottle to retaliate against Taylor and her family for their treatment of him in the past. We conclude, therefore, that the evidence is sufficient to sustain the defendant's convictions for first degree premeditated murder and attempted first degree premeditated murder.

### III. Consecutive Sentencing

As his final issue, the defendant contends that the trial court erred in ordering consecutive sentencing. Specifically, he asserts that the trial court erroneously ordered consecutive sentencing based on its finding that he was a dangerous offender without making a "proper determination of the Wilkerson factors" required for the imposition of consecutive sentencing under the dangerous offender criterion. The State responds by arguing that the record supports the trial court's imposition of consecutive sentencing under any of the three criteria found by the trial court. We agree with the State.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is an offender whose record of criminal activity is extensive," that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," or that "[t]he defendant is sentenced for an offense committed while on probation." Tenn. Code Ann. § 40-35-115(b)(2), (4), (6) (2010). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). The criteria listed in section 40-35-115(b) are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

In its ruling, the trial court noted that the defendant's presentence report reflected that he had an "atrocious record" consisting of a total of eight prior felonies, numerous misdemeanors, and two violations of probation. The court also noted that he committed the instant offenses while on probation. The court, therefore, found that the defendant was on probation at the time of the offenses and that his record of criminal activity was extensive. Characterizing the crimes as "horrendous" and "atrocious," the court further found that the defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. In so doing, the court made the required Wilkerson findings, as reflected in the portion of the trial court's lengthy and comprehensive ruling that we have quoted below:

> The circumstances surrounding the commission of this offense are aggravated. He had a history of abusing this poor woman going way back, way back to when they were young. And if not for her mother coming to her defense, she may have met an early departure from this world much, much sooner. But her mother came to her defense and since that day he's held animosity towards them. I find that to be true.
>
> The commission of the actual offense here also is aggravated. We have all these poor kids running around with the person they come to know as their father is trying to gun them down. How much worse can it possibly get for someone? So to say that the aggregate length of these sentences reasonably relates to the offense for which the defendant stands convicted if I run these

consecutive is an understatement.

He is a violent offender. He's a professional criminal and such that he does not deserve to see the streets of Memphis, Shelby County again. And the decent law-abiding citizens would be happy to hear that he will serve a sentence of life plus 90 years, 25, 25, 25 and 15.[3]

We, therefore, agree with the State that the record supports the imposition of consecutive sentencing under any of the three criteria found by the trial court. Accordingly, we affirm the sentencing determinations of the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

---

[3]As we have set out, at the motion for new trial hearing, the trial court dismissed the firearm conviction, resulting in the defendant's sentence being life plus seventy-five years.